IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: ) | |
| ) | Magistrate No. 21-1514 |
| CONTENTS OF BLACK iPHONE CELLULAR ) | |
| TELEPHONE WITH SIM CARD NUMBER ) | |
| TF256PSIMV97N 89148000006425874391 ) | |
| UTILIZED BY SHAIQUANE HARRISON ) | |

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

I, Brian K Dodd, an Inspector for the U.S. Postal Inspection Service (USPIS) being duly sworn, depose and state that:

**AGENT BACKGROUND**

1.  I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.  I am a United States Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since April 2016. I am currently assigned to the Narcotics and Money Laundering Team at the USPIS's Pittsburgh, Pennsylvania field office. In this capacity, I am responsible for investigating the use of the United States Mails for the purpose of transporting controlled substances such as methamphetamine, heroin, fentanyl, fentanyl-related analogs, cocaine, and other controlled substances, in violation of Title 21, United States Code, Sections 841(a)(l) (manufacturing, distribution, or possession with the intent to manufacture or distribute a controlled substance), 843(b) (unlawful use of a communication facility in the commission of a crime), and 846 (drug conspiracy). In addition, I am responsible for investigating possible violation of 18 U.S.C. §§ 1956 and 1957 (money laundering).

3. I have been involved in the investigation and discovery of drug contraband and drug proceeds on multiple occasions. I have personally been the affiant for search warrants which have resulted in the discovery of controlled substances and drug proceeds. My current assignment involves investigating the use of the U.S. Mails by drug traffickers, in which established drug package profiles, surveillance, and drug detection dogs, among other investigative tools, are utilized.

## DEVICE TO BE SEARCHED

4. This affidavit is submitted in support of a warrant authorizing the search of the cellular telephone with telephone SIM card number TF256PSIMV97N 89148000006425874391 hereinafter referred to as **TARGET DEVICE**, utilized by Shaiquane Harrison.

5. For the reasons set forth below, I submit there is probable cause to believe that Shaiquane Harrison has committed offenses prohibited under federal law, including Possession With Intent to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 841(a), and Conspiracy to do same in violation of 21 U.S.C. § 846. There is also probable cause to believe that evidence of these offenses will be present on the **TARGET DEVICE**.

6. **TARGET DEVICE** has been in secure law enforcement custody since the time it was recovered (the circumstances of which are explained more fully below).

7. I have obtained the information contained in this affidavit from personal investigation and from reviewing information obtained from other law enforcement officers. Since this affidavit is being submitted for the limited purpose of securing a search warrant for the **TARGET DEVICE**, your affiant has not included each and every fact known to him concerning this investigation. Your affiant has set forth only the facts that he believes are necessary to establish probable cause for a search warrant for the **TARGET DEVICE**.

**PROBABLE CAUSE**

8. Your Affiant incorporates by reference the affidavit filed at No. 21-431, No 21-439, 21-457, 21-470, 21-498.

9. On February 26, 2021, Postal Inspector Brian Dodd interdicted Priority Mail Parcel 9505 5162 0948 1054 7016 99 (the Subject Parcel), addressed to "Kimberly Cruz, 912 Rostraver St., Monessen PA 15062, with a return address of "Jose Cruz, 1051 Calle 3 SE Apt 713, San Juan PR 00921". Due to the Subject Parcel matching certain characteristics of the established drug profile, as discussed below, the Subject Parcel was pulled from the mail stream for further investigation. The Subject Parcel is a priority mail medium flat rate box measuring approximately 12" X 3.5" X 14" weighing approximately 4 lbs. 14 oz. and bearing $15.50 in postage.

10. On February 26, 2021, electronic inquiries of the CLEAR database were made for the purpose of confirming the validity of the recipient's name and address contained on the Subject Parcel. The CLEAR inquiry confirmed 912 Rostraver Street is a valid address in the 15062 zip code. However, according to CLEAR, Kimberly Cruz is not associated with the address.

11. On February 26, 2021, electronic inquiries of the CLEAR database were made for the purpose of confirming the validity of the return name and address contained on the Subject Parcel. The CLEAR inquiry confirmed 1051 Calle 3 SE APT 713 is a valid address in the 00921 zip code. According to CLEAR, Jose Cruz is not associated with the address.

12. On February 26, 2021, Inspector Dodd contacted Ohio Township K9 Officer Wallace for a K9 examination of the subject parcel. K9 Larry examined the parcel. According to Officer Wallace, Larry positively alerted to the subject parcel, indicating the presence of controlled substances within the subject parcel.

13. Continuing on February 26, 2021, the Honorable Maureen P. Kelly, United States

Magistrate Judge for the Western District of Pennsylvania, signed a search and seizure warrant, which is docketed at Magistrate No. 21-431, authorizing the search of Priority Mail parcel bearing USPS tracking number 9505 5103 0239 1025 4288 80.  On February 27, 2021, U.S. Postal Inspectors opened the Subject Parcel and recovered within approximately 2.55 pounds of a white powder substance that field tested positive for cocaine.  A drug laboratory later confirmed the parcel contained over 1 kilogram of cocaine, a Schedule II controlled substance.

14. On or about March 1, 2021, your affiant, along with additional law enforcement personnel, conducted a controlled delivery of the subject parcel to the residence located at 912 Rostraver St, Monessen, PA 15062. In preparation for the controlled delivery, law enforcement replaced the cocaine with sham and placed both a beeper and GPS device inside the subject parcel. The beeper would alert law enforcement when the parcel was opened, and the GPS device would provide location data on the subject parcel.

15. On March 1, 2021 at approximately 1:35 PM Priority Mail parcel 9505 5162 0948 1054 7016 99 (subject parcel) was delivered to 912 Rostraver St, Monessen, PA 15062 by a U.S. Postal Inspector in an undercover capacity.  The subject parcel was left on the front porch after the Inspector knocked on the front door and received no response.

16. At approximately 2:02 PM, an unknown black male (later identified as SHAIQUANE HARRISON) driving a Silver Nissan Rogue, Maryland tag 3EA6198, obtained the subject parcel off the porch of 912 Rostraver Street. Law Enforcement setup near the residence observed Harrison utilizing a cell phone in a blue and white case. Harrison was also observed with an L shaped imprint weighting down the front of his sweatshirt. Law enforcement recognized this to be consistent with possessing a firearm. Harrison proceeded to leave the residence and drove around the block. Based upon training and experience, your affiant believes Harrison was

attempting to conduct counter surveillance in order to mitigate the risk of detection by law enforcement authorities or other parties.

17. At approximately 2:07 PM, law enforcement officers observed Harrison park in front of 909 Somerset St, Monessen, PA 15062. Harrison then exited the vehicle, with the subject parcel in his right hand, and entered 909 Somerset St., Monessen, PA 15062, shutting the door behind him.

18. At approximately 2:10 PM, law enforcement officers could no longer detect the beeper inside the subject parcel. Based upon training and experience, your affiant knows that the lack of transmission from the beeper means it either ran out of battery or was destroyed. Prior to the controlled delivery operation, law enforcement fully charged the beeper's battery. Thus, law enforcement determined that someone opened the parcel and destroyed the beeper. Based upon training and experience, your affiant believed that the destruction of the beeper meant there was a risk of both flight and destruction of evidence. As a result, law enforcement determined exigent circumstances existed to enter the residence.

19. Once entry was made to the residence, law enforcement officers witnessed Harrison flee out of the back and attempt to conceal items inside a shed behind the residence. At this time, law enforcement officers identified themselves to Harrison. In response, he exited the shed and fled on foot. Law enforcement officers last observed Harrison jumping the fence between 221 2nd Street. Law enforcement officers located a cell phone on the ground outside the shed and a firearm inside the tire of a vehicle in the shed. The cell phone located on the ground outside the shed had a blue and white otter box case on it. The cell phone located on the ground outside the shed appeared to be the same as the one Harrison had when he first took possession of the subject parcel.

20. Thereafter, law enforcement requested the target vehicle be towed to Pidich

Towing. The target vehicle was taken to Pidich Towing in their secure impound lot located at 1500 Route 481 Charleroi PA 15022. On March 3, 2021 a search warrant for the Silver/Gray Nissan Rogue bearing MD Registration 3EA6198 was signed at Magistrate No. 21-470. On March 4, 2021, Law Enforcement searched the Silver/Gray Nissan Rogue bearing MD registration 3EA6198. During the search of the vehicle law enforcement found a receipt for Big's Trucking. The receipt had a handwritten customer name of Shaiquan Harrison, 901 Meadows Ave, Charleroi PA 15022.

21.     Subsequently, your affiant applied for and obtained a federal search warrant at Magistrate No. 21-498 for the phone recovered near the shed Harrison was observed fleeing. A search of the phone resulted in the discovery of "selfie" style photographs depicting Harrison, texts notifying Harrison that the subject parcel was mailed, and the tracking number for the subject parcel saved in the "notes" section of the phone. Based upon this search, your affiant determined that the phone belonged to Harrison and that he used the phone in furtherance of his drug trafficking crime.

22.     On June 8, 2021, a grand jury sitting in the Western District of Pennsylvania returned a one count Indictment against Harrison, charging him with Attempt to Possess With Intent to Distribute Over 500 Grams of Cocaine, in violation of Title 21, United States Code Section 846 (Criminal No. 21-248). On June 9, 2021, a federal arrest warrant was issued.

23.     On July 15, 2021, Monessen Police Department arrested Harrison at 1240 Highland Ave, Monessen, PA. At the time of his arrest, officers detected the strong odor of marijuana emanating from within the residence. Thereafter, Harrison informed officers that his five (5) year old son was on the second floor of the residence and that he wanted to contact the child's mother to ensure the child had supervision prior to his transportation to the police department. As a result,

officers permitted Harrison to call the mother using the **TARGET DEVICE**. After the call completed, officers observed Harrison enter the "settings" portion of his phone. Based upon law enforcement experience and training, the arresting officers knew that device information could be deleted using the "settings" portion, giving cause to remove the **TARGET DEVICE** from Harrison and placed it on the kitchen island.

24. When the mother arrived on scene, an officer escorted her upstairs to retrieve the child in order to preserve the scene and ensure officer safety. While escorting the mother, the officer observed, in plain view, bulk U.S. currency on both the kitchen counter and floor of an upstairs bedroom. The officer observed that the U.S. currency appeared to be in smaller denominations, which your affiant knows to be indicative of drug profits from street level narcotic sales. In addition to the child, the mother retrieved a pink bag and hooded sweatshirt, which she placed on a patio swing on the front porch of the residence. As the bag was open, an officer observed in plain view additional bulk U.S. currency and what appeared to be a clear knotted sandwich bag. Given these observations, law enforcement believed controlled substances and evidence of drug trafficking were present in Harrison's residence.

25. Subsequently, Jeff Smaracheck, a Monessen Police Officer and DEA Task Force Officer, applied for a state search warrant for the residence. Magisterial District Judge Wayne P. Vlasic, County of Westmoreland, approved the search warrant. The execution of the search resulted in the seizure of Harrison's identification, bulk U.S. currency, digital scale, digital money counter, suspected marijuana, and the **TARGET DEVICE**.

26. Based upon training and experience, your affiant knows that drug traffickers use multiple cellular devices to conduct their illicit activities. Moreover, lost or destroyed phones are quickly replaced in order to continue engaging in those illicit acts. As discussed above, your affiant

determined that Harrison utilized his phone to track and take possession of the subject parcel. In light of the aforementioned seizures from Harrison's residence, and his accessing the "settings" portion in a potential attempt to delete information, there is probable cause to believe that the **TARGET DEVICE** also contains evidence of drug trafficking.

### EVIDENCE COMMONLY GENERATED BY DRUG-TRAFFICKING AND ELECTRONICALLY STORED IN CELLULAR TELEPHONES

27. Your Affiant is aware through both training as well as experience gained through multiple narcotics investigations, the targets of those narcotics investigations utilize cellular telephones to not only arrange meetings with their drug customers but also speak with fellow co-conspirators as well as their drug sources of supply. Your Affiant is also aware that these targets also utilize multiple cellular telephones at one time in an effort to not only thwart detection by law enforcement but also to compartmentalize their drug trafficking customers to one phone, their co-conspirators to another phone, and their drug source of supply to yet another phone.

28. Based upon my training and experience, I am aware that it is generally a common practice for drug traffickers to store the names and phone numbers of drug customers and photographs and video detailing illegal activities in cellular telephones. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier(s) and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

29. Persons involved in significant drug trafficking typically conceal within automobiles large amounts of currency, financial instruments, precious metals, jewelry and other items of value, and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money derived from narcotic trafficking activities. This type of evidence can also be stored in applications that are commonly found on "SMART" cellular telephones.

30. Members of Drug Trafficking Organizations (DTO) often take group photographs with other enterprise members posing with paraphernalia, money and/or drugs. Many cellular telephones have a camera feature that is readily capable of capturing and storing these group photos. In my experience, the phones of individuals who illegally possess firearms often contain evidence of unlawful firearm possession in the form of text messages, e-mails, and social media posts. It has also been my experience that such phones often contain information regarding how an unlawful possessor acquired his firearm.

31. Members of DTOs often store each other's phone numbers and contact information in the directories of their cellular phones.

32. Based on my experience and familiarity with cellular telephones, I am aware that the telephones have voicemail and telephone directory features, as well as camera features which allow the user to take photographs and store them in the cellular phone's memory card. Based on my experience and training, statements by other law enforcement officers, and personal observations, I know that because of the storage capacity of cellular telephones, the portability of cellular telephones, the ease with which information stored on a cellular telephone may be accessed and/or organized, and the need for frequent communication in arranging narcotics transactions, cellular telephones are frequently used by individuals involved in drug trafficking. In particular,

I and other law enforcement officers have found that information frequently maintained on cellular telephones includes the contact numbers of other co-conspirators, contact numbers for narcotics customers and stored photographs of DTO activities. This evidence will come in the form of caller identification information, call log information, telephone numbers, address information, or other identification information, as well as opened and unopened voicemail and/or text messages, photographs, videos and information about access to the Internet.

33. Members of DTOs routinely use multiple physical phones in succession as one breaks or the DTO feels that the number associated with the phone is compromised to Law Enforcement. The physical phone may no longer be an active communicative device, however many times, these old phones are not discarded as they possess value to the DTO. The replaced device contains within it the contact information for drug customers of the DTO, and many times these phones are maintained as digital phone books should the new active phone become unusable or unavailable. Furthermore, these replaced phones are commonly kept in a relatively accessible location where either all or select members of the DTO can access the information within should it become necessary. As stated above, members of DTOs routinely take photographs and or memorialize other information of evidentiary value within these replaced phones. As such, it is common to recover a multitude of otherwise inactive phones especially at locations central to or important to the DTO.

## TECHNICAL TERMS

34. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communications through radio signals. These telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless

telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

35.     GPS:  A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

36.     Internet:  The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

37. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

38. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

 a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

 b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

 c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

 d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by

      a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

39.   *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

40.   Based upon the foregoing, I submit that this affidavit establishes probable cause for a search warrant authorizing the examination of the **TARGET DEVICE**, as described in Attachment A, to seek the items described in Attachment B.

The above information is true and correct to the best of my knowledge, information and belief.

                                                        */s/ Brian K. Dodd*
                                                        Brian K. Dodd
                                                        U.S. Postal Inspector
                                                       U. S. Postal Inspection Service

Sworn and subscribed to me, by telephone
Pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
this 23rd day of July, 2021.

_____
The Honorable Cynthia Reed Eddy
United States Magistrate Judge

## **ATTACHMENT A**

*Item to Be Searched*

**TARGET DEVICE**: Black iPhone Cellular Telephone with SIM card number TF256PSIMV97N 89148000006425874391, utilized by Shaiquane Harrison. The **TARGET DEVICE** is currently located at U.S. Postal Inspection Service Head Quarters in Robinson Township, Pennsylvania.

## ATTACHMENT B

*Items to be Seized*

1. All records, information, and items evidencing who used the device and/or when and/or from where, and violations of Title 21, United States Code, Sections 841 and 846, including:

    a. incoming and outgoing call and text message logs

    b. contact lists

    c. photo and video galleries

    d. sent and received text messages

    e. online searches and sites viewed via the internet

    f. online or electronic communications sent and received, including email, chat, and instant messages

    g. sent and received audio files

    h. navigation, mapping, and GPS files

    i. telephone settings, including speed dial numbers and the telephone number for the subject telephone and related identifying information such as the ESN for the telephone

    j. call forwarding information

    k. messages drafted but not sent

    l. voice messages

2. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form. However, no real-time communications will be intercepted and searched during service.